**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.

**MICHAELA WRIGHT**;

      Plaintiff;

v.

**FALCON SCHOOL DISTRICT 49;**

**FRANKLIN HINSON**, individually, and in his official capacity as a JROTC instructor with Falcon School District 49;

**JERRY EASLEY**, individually, and in his official capacity as a JROTC instructor with Falcon School District 49;

**BILL HARTLEY**, individually, and in his official capacity as a JROTC instructor with Falcon School District 49;

      Defendants.

---

## COMPLAINT WITH JURY DEMAND

---

    Plaintiff Michaela Wright ("Ms. Wright" or "Plaintiff") hereby respectfully files this action against Defendants Falcon School District 49 ("District" or "Falcon 49"), Franklin Hinson ("Defendant Hinson"), Jerry Easley ("Defendant Easley"), and Bill Hartley ("Defendant Hartley") (collectively "Defendants") through the undersigned counsel of record Kishinevsky & Raykin, Attorneys at Law, and state on information and belief as follows. This action seeks equitable relief and appropriate damages and costs.

### I.     JURISDICITON AND VENUE

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331. Federal question jurisdiction arises under the Constitution and laws of the United States of America.

2. At all relevant times, Plaintiff was a resident of Peyton, Colorado in El Paso County, Colorado.

3. Defendant Falcon School District 49 is likewise located in, and has its principal place of business in, El Paso County Colorado.

4. The remaining individual Defendants were, at all relevant times, residents of Colorado and all were employees of the District at the times of the wrongdoings alleged herein.

5. The wrongful acts alleged by Plaintiff occurred in whole or in part in El Paso County, Colorado.

6. Venue is proper pursuant to 28 U.S.C. § 1391(b).

## II.      FACTUAL BACKGROUND

7. At all times relevant to this litigation, Plaintiff was a minor student at Falcon High School ("FHS" or "School"), a public school within Falcon School District 49 ("Falcon 49" or "District").

8. Falcon High School currently hosts the Space Force Junior Reserve Officer Training Corp. ("JROTC") C)-20031 program. During the time Plaintiff attended FHS, the JROTC program was operated by the United States Air Force. Plaintiff participated in the JROTC program.

9. JROTC is a federally funded program intended to "instill in students in United States secondary educational institutions the values of citizenship, service to the United States . . . and personal responsibility and a sense of accomplishment." 10 U.S.C.S. § 2031(a)(2).

10. JROTC operates within public and private high schools, under the combined oversight of the United States military apparatus and the local education agency ("LEA"). While the U.S. military branch associated with the specific JROTC program plays a supervisory role over the JROTC instructors, the program itself is administered through the individual school and LEA.

11. Senior JROTC instructors must be retired officers with qualifications including, among others, "[p]rofessional military qualification . . . a baccalaureate degree . . . [and] [c]ompletion of secondary education teaching certification requirements . . ." 10 U.S.C. § 2033(b)(2).

12. Non-senior JROTC instructors are retired noncommissioned officers with similar additional requirements. 10 U.S.C. § 10(c)(2).

13. JROTC programs are typically administered by a senior instructor and one to two non-senior instructors.

14. In 2019 Defendant Hinson took over the position of senior instructor for the FHS JROTC program.

15. During Plaintiff's time in the FHS JROTC program, Defendants Easley and Hartley occupied the non-senior instructor roles.

### III.    FACTUAL ALLEGATIONS

16. By her senior year, 2021-2022, Plaintiff received the rank of cadet Lt. Col. and an accompanying command position as Corp. Commander.

17. She received the promotion and assignment on May 4, 2021. However, tragically, the same day, she was sexually assaulted by another JROTC cadet and FHS student, [STUDENT 1].

18. [STUDENT 1]'s actions caused Plaintiff severe distress that day, causing her, a state champion public speaker, to freeze, stutter, and apologize repeatedly as she spoke to the FHS JROTC attachment following her promotion. Despite her obvious demeanor, none of the JROTC instructors present inquired about the cause of her distress. [STUDENT 1] received a similar promotion and command assignment, and the program continued with preparations for the 2021-2022 academic year.

19. [STUDENT 1]'s misconduct towards the Plaintiff was not an isolated event. [STUDENT 1] sexually harassed, groped, and fondled Plaintiff and other female JROTC cadets on multiple other occasions. His conduct was sufficiently pervasive that Plaintiff and other female cadets warned female cadets and JHS students when they were likely to find themselves in his presence.

20. On or about June 1, Defendant Hartley observed Plaintiff's habit of avoiding [STUDENT 1]. Defendant Hartley instructed Plaintiff to work with [STUDENT 1] to avoid drama in the JROTC unit. Neither Defendant Hartley, nor any of the other JROTC instructors, investigated [STUDENT 1's] behavior or the cause of Plaintiff's reaction.

21. When school resumed in the fall of 2021, Plaintiff found herself in such a position after overhearing [STUDENT 1] engaging in a sexually explicit conversation with other male cadets.

22. On or about August 23, 2021, the Plaintiff overheard [STUDENT 1] engaging in a sexually explicit and threatening conversation regarding female JROTC cadets. The Plaintiff warned her friend, and fellow JROTC cadet [STUDENT 2] about [STUDENT 1]'s statements. [STUDENT 2] reported the conversation.

23. On or about August 23, 2021, upon learning of the report, Defendant Hinson called the Plaintiff into his office. There, along with Defendant Easley and Hartley, he questioned the Plaintiff surrounding the conversation she overheard the same day.

24. Defendant Hinson's aggressive demeanor distressed the Plaintiff, who began crying as Defendant Hinson continued to question and challenge her account of the conversation. Ultimately, Defendant Hinson scolded the Plaintiff for: 1) warning [STUDENT 2] about the conversation, 2) failing to confront [STUDENT 1] about the conversation and resolve it amongst themselves, and 3) for allowing the report to spread to FHS administration rather than keeping it within the JROTC program.

25. As Defendant Hinson continued upbraiding the Plaintiff, she tearfully disclosed [STUDENT 1]'s history and reputation. She specifically disclosed [STUDENT 1]'s prior sexual misconduct against her personally. In response, Defendant Hinson criticized the Plaintiff for making such an accusation and dismissed her from his office.

26. That night, the Plaintiff's parents received two phone calls. The first, was from Michael Champlain, the Dean of Students at FHS. Mr. Champlain disclosed to Plaintiff's parents that the Plaintiff was involved in a reported incident as a witness. He clarified that she was not a victim in this incident.

27. The second call was from Defendant Hartley. Defendant Hartley spoke briefly with Plaintiff's parents, explaining that Plaintiff had made an accusation. Defendant Hartley informed the Plaintiff's parents that, that day, she was the most upset he had ever seen her. He described the situation as a male cadet who was "a little aggressive." Defendant Hartley informed the Plaintiff's parents that FHS administration would handle the complaint.

28. Based on these phone calls and other facts discussed hereafter, it is evident that the report Mr. Champlain referred to in his conversation with the Plaintiff's parents was [STUDENT 2]'s report about the sexually explicit and threatening conversation Plaintiff overheard. Contrarily, Defendant Hartley's statements clearly referenced the Plaintiff's disclosure of sexual harassment and assault. Neither Defendant Hartley, nor either of the other JROTC instructors involved reported the Plaintiff's statement to FHS administration nor her parents.

29. On or about August 24, Defendant Hinson required the Plaintiff to provide the JROTC instructors with a written statement regarding the conversation she overheard the day before.

30. On or about August 25, 2023, Defendant Hinson called the Plaintiff into his office to discuss her allegation against [STUDENT 1]. During this meeting, Defendant Hartley left part way through.

31. Throughout the day, Defendant Hinson called the Plaintiff back into his office multiple times. During these sessions, he repeatedly challenged the Plaintiff's written and oral statements. He insinuated her statement was a lie, degraded her integrity, and suspended her from her command position. After the final session, Defendant Hinson gave the Plaintiff an ultimatum to tell him "the truth" about [STUDENT 1] or face continued consequences.

32. Emotional and in shock, the Plaintiff spent the remainder of the day in severe distress, alternating between tears and despondency. When she encountered Defendant Hinson again that afternoon, he instructed her not to communicate with individuals outside of the

JROTC instructors. He then pushed her to concede that she had "misheard" [STUDENT 1].

33. On or about August 26, 2021, Defendant Hinson again called the Plaintiff into his office. During this meeting, Defendant Hinson pressured the Plaintiff to agree with him. The Plaintiff did not understand what Defendant Hinson wanted her to agree with, but after sustained pressure, she submitted. Upon receiving her agreement, Defendant Hinson temporarily reinstated her command position.

34. Due to the Plaintiff's confusion and Defendant Hinson's later, less than clear, statements about his conduct, it is not clear what exactly he pressured the Plaintiff to agree with. However, as discussed herein, after FHS finally became aware of the situation, FHS assistant principle, Chad Belveal, believed that the Plaintiff recanted her initial allegation. Based upon this and Defendant Hinson's statements, it is likely that the Defendant Hinson later addressed this "agreement" as a recantation by the Plaintiff. Importantly, Plaintiff *never* actually recanted her statements.

35. On or about August 27, 2021, during the Plaintiff's JRTOC commanders call—a session in front of the entire corp. of cadets—Defendant Hinson taught a new lesson to the cadets. The lesson revolved around a hypothetical situation where a male cadet misinterprets a female cadets conduct as sexually offensive. Defendant Hinson concluded the lesson by instructing the cadets to address such situations between themselves. The Plaintiff and many other JROTC cadets felt that the lesson was given based on the Plaintiff's ongoing situation with [STUDENT 1] and the JROTC instructors.

36. In the interim, between August 26 and 27, 2021, undisclosed third-party female cadets created and authored a petition to FHS administration detailing [STUDENT 1]'s history

of sexual misconduct. Cadets aware of the petition informed the Plaintiff. Other cadets informed the JROTC instructors.

37. On or about August 27, 2021, Defendant Hinson called the Plaintiff and a male cadet commander into his office where he ordered them to shut the petition down. The JROTC instructors stated that such students did not belong in JROTC and that every name on signatory would be removed from the program. The Plaintiff understood this statement as an implicit threat to dismiss the petition authors.

38. The Plaintiff went to the students who had informed her of the petition. She informed them of Defendant Hinson's order, and, in turn, the petition was destroyed.

39. The same day, Defendant Hinson again called the Plaintiff to his office, where he ordered her to produce the names of the students who authored and signed the petition. The Plaintiff did not believe it was proper for her, as a student, to expose the names of the students—including non-JROTC cadets—who had signed the petition. She also did not believe it was proper that the students should be punished for attempting to do what they believed was right. The Plaintiff refused to provide names.

40. Defendant Hinson confronted the Plaintiff in front of the JROTC cadet who reported the petition. Defendant Hinson's outburst was sufficiently distressing that the—male—cadet [STUDENT 3] advised the Plaintiff to report the ongoing issues to FHS administration. The Plaintiff and [STUDENT 3] went to Mr. Belveal and reported [STUDENT 1]'s ongoing sexual misconduct and Defendant Hinson's attempts to retaliate and silence the JROTC program generally and the Plaintiff specifically.

41. That afternoon, Mr. Belveal separately informed the FHS school resource officer ("SRO") and the Plaintiff's parents of the report. Due to other matters, the SRO was

unable to speak with the Plaintiff until September 7, and the Plaintiff's parents on September 13.

42. On or about August 30, 2021, Defendant Hinson conducted a forced mediation session between [STUDENT 1] and [STUDENT 2]. [STUDENT 2] informed the Plaintiff of the session as well as her desire not to attend. However, she felt that she could not refuse Defendant Hinson's order.

43. The mediation was conducted close to the Plaintiff's JROTC class session, and she overheard Defendant Hinson and [STUDENT 1] discussing the session thereafter. The Plaintiff specifically overheard Defendant Hinson state that he and [STUDENT 1] would conduct multiple other such sessions with other female cadets. The Plaintiff understood this to mean that Defendant Hinson would require [STUDENT 1]'s victims, including herself, to attend closed mediation sessions with him and Defendant Hinson as a condition of their participation in JROTC.

44. The same day, on or about August 30, Defendant Hinson summarily suspended the Plaintiff and [STUDENT 1] from their command positions. Defendant Hinson then met individually with the Plaintiff and degraded her for a lack of integrity and leadership for reporting [STUDENT 1] to FHS administration. Defendant Hinson threatened the Plaintiff with dismissal from JROTC and conditioned her continued rank, position, and enrollment on submitting to his orders and command structure, as well as on disclosing the authors of the petition against [STUDENT 1].

45. Throughout the remainder of the day, Defendant Hinson repeatedly dispatched Defendant Hartley to interrogate the Plaintiff about the identities of the petition authors. Again, the

Plaintiff refused to provide names because she believed Defendant Hinson would have retaliated against the students.

46. On or about August 31, 2021, Defendant Hinson excluded the Plaintiff from participation in the Wings of the Marianas event. The Plaintiff had been signed up for the event throughout the fall semester, but the day of, suddenly found herself removed from the list of cadets attending. When the Plaintiff spoke with some of the cadets who attended the event, they informed her that Defendant Hinson spoke confidently about having "removed the drama" from the trip. The cadets and the Plaintiff took this statement to mean that Defendant Hinson excluded the Plaintiff based on the "drama" of the Plaintiff's report.

47. Defendant Hinson continued this practice of excluding the Plaintiff by removing her from both the AFA football game and the Eastonville Cleanup. The Eastonville Cleanup was a charity event the Plaintiff was scheduled to participate in and supervise and was necessary for her to letter in JROTC.

48. On or about September 7, 2021, Defendant Hinson permanently removed Ms. Wright from her command position and demoted her to Tech Sargent, the second lowest rank available for a senior JROTC cadet.

49. On or about September 13, 2021, Ms. Wright's parents met with Mr. Belveal and FHS's SRO. The SRO confirmed that Ms. Wright's report was credible. He also acknowledged that [STUDENT 1] made statements corroborating the underlying facts of Ms. Wright's report. At that time, Ms. Wright's parents informed FHS of other specific instances of [STUDENT 1's] sexual misconduct, including altercations in May and June 2021.

50. On or about September 17, 2021, Defendant Hinson directed Defendant Hartley to modify Ms. Wright's schedule. Defendant Hinson attempted to change Ms. Wright's JROTC class session, terminating her position as an office aide, and segregating her from junior cadets.

51. On or about September 21, 2021, Defendant Hinson informed Ms. Wright that she was disqualified from applying for a J-100 scholarship. The scholarship provides recipients full tuition at a university with an AFJRTOC detachment, a $10,000 yearly housing allowance, an annual book stipend, and a monthly individual stipend. Ms. Wright intended to apply for the scholarship to further her goals of becoming an officer in the U.S. Air Force.

52. Prior to September 21, 2021, Ms. Wright's physical fitness test ("PFT") and SAT scores were below the necessary level. However, both she and another, male, cadet in the same position were permitted to improve their scores during the fall 2021 semester. However, Ms. Wright's improvement period was cancelled after September 21, 2021, while the male cadet's period continued. There was no material change in Ms. Wright's qualifications before and after September 21, 2021. The only significant change was her report of [STUDENT 1's] conduct.

53. On or about September 22, 2021, Defendant Hinson threatened Ms. Wright with permanent dismissal from JROTC.

54. On or about September 23, 2021, Ms. Wright's mother met with the JROTC instructors and school administrators. Defendants Easley and Hartley did not speak during the meeting. Throughout the meeting, Defendant Hinson repeatedly degraded Ms. Wright's character and integrity. Defendant Hinson criticized Ms. Wright as a failed leader and

cadet. He challenged her report as incredible, and implied that she lied to the JROTC instructors in her initial statement, and only reported [STUDENT 1] when challenged by the JROTC instructors.

55. Defendant Hinson also misrepresented that he reported Ms. Wright's initial statements to FHS administration. Defendant Hinson's statement directly conflicts with Mr. Belveal's indication that he was unaware of any issues occurring between Ms. Wright and [STUDENT 1] prior to the report made by Ms. Wright on August 27, 2021.

56. As of September 22, 2021, FHS was fully aware of the ongoing issues within its JROTC program. It was fully aware that Ms. Wright credibly accused [STUDENT 1] of sexual misconduct and that Ms. Wright and her family were facing retaliation from the JROTC instructors. However, throughout September 2021, FHS chronically failed to protect Ms. Wright from both ongoing harassment and intimidation by [STUDENT 1] and retaliation by the JROTC instructors.

57. Throughout September 2021, [STUDENT 1] remained in Ms. Wright's JROTC class session. Furthermore, no steps were taken to prevent [STUDENT 1] from harassing and attempting to intimidate Ms. Wright. Throughout the month, Ms. Wright purposefully arrived late to JROTC class to avoid [STUDENT 1]. However, [STUDENT 1] would wait for Ms. Wright to arrive, and then would seat himself as close to her as possible. Throughout the sessions, [STUDENT 1] would find opportunities to physically contact Ms. Wright, which he phrased as "accidents." The JROTC instructors took no action to separate [STUDENT 1] nor to address his repeated attempts to intimidate Ms. Wright.

58. During September 2021, FHS initiated a Title IX investigation into Ms. Wright's report and directed Defendant Hinson to cease excluding Ms. Wright from JROTC events.

However, in response, Defendant Hinson terminated all of Ms. Wright's non-scheduled activities, privileges, and bonuses.

59. For example, throughout the semester Ms. Wright worked as Defendant Hartley's teaching aid. Ms. Wright was scheduled as Defendant Easley's aid, but Defendant Hartley's class had more junior cadets, so throughout the semester Ms. Wright supported Defendant Hartley. Following the School's directive to cease excluding Ms. Wright, Defendant Hinson terminated this agreement.

60. Defendant Hinson did not just terminate Ms. Wright's aid-ship with Defendant Hartley. When she returned to Defendant Easley, he also modified her duties. Defendant Easley dispatched Ms. Wright to perform inventory rather than work as an aide. Ms. Wright's duties did not include inventory, which was a duty assigned to another cadet.

61. In response to the continued retaliation, Ms. Wright withdrew her application to the U.S. Air Force Academy and deleted other college application materials.

62. On or about October 1, 2021, Defendant Hinson announced new plans to appoint a new cadre of JROTC commanders. This decision deviated from tradition and modified the application process Ms. Wright and other commanders completed in the spring of 2021. Specifically, Defendant Hinson's proposition would have created a dual corp. commander role, with one cadet acting as corp. commander and another as deputy commander on alternating semesters. This system would have, again, functionally removed Ms. Wright from her position for the remainder of the year.

63. However, on or about October 5, 2021, FHS directed Defendant Hinson to reinstate Ms. Wright's previous rank and position. FHS's direction clarified Defendant's Hinson's plan for a new cadre. While FHS had directed him to reinstate Ms. Wright to her previous

position, FHS had issued no directives regulating *future* appointments. Under the new plan, Defendant Hinson could, again, remove Ms. Wright from her position without interfering with FHS's directives.

64. Defendant's Hinson further evidenced this intent by creating a contract for all JRTOC commanders. The contract required commanders to conduct all JROTC commanders in the presence of JROTC instructors, meaning JROTC instructors would be directly supervising all conduct and communication between JROTC cadets.

65. Defendant Hinson's new contract had the double effect of also precluding Ms. Wright from completing her duties. Since being suspended on August 2, Ms. Wright's duties as Corp. Commander had gone unfulfilled. Upon reinstatement on October 5, Ms. Wright only had approximately four weeks to complete the preparations for the Veterans Parade and Military Ball, two November JRTOC events. However, fall break, which occurred from October 11 to October 25, 2021, removed two of those weeks, as Ms. Wright was not able to communicate with any other JROTC cadets during this time nor complete any of her duties. In actuality, from her suspension, termination, and reinstatement, Ms. Wright was only provided two weeks to complete preparations for the events.

66. Ms. Wright completed her duties for both the Veterans Parade and the Military Ball. However, the JROTC instructors criticized her for procrastination and failures as a leader, despite preventing her from taking any action for the significant majority of the semester.

67. During the same time frame, November 2021, Defendant Hinson required all senior command cadets to complete self-evaluations of their performance in their positions and as leaders. Even though Ms. Wright actually only served in her position for five total

weeks to this point, Defendant Hinson required Ms. Wright to complete the evaluation as if she had held her position throughout the semester like the other cadet commanders.

68. On or about October 25 and November 2, 2021, Defendant Easley also cited and criticized Ms. Wright for failing to appear at early-morning review session. However, Defendant Easley only notified Ms. Wright of the sessions the same morning. On both occasions, Defendant Easley sent Ms. Wright the notifications while she was at home asleep. Aside from failing to properly notify Ms. Wright, Defendant Easley also criticized Ms. Wright for failing to attend the sessions even though Ms. Wright had no transportation to take her to FHS early in the morning, with, essentially, no notice.

69. On or about November 19, 2021, the District concluded the Title IX investigation and published a summary of its findings. The District concluded that Ms. Wright's report of [STUDENT 1's] conduct was credible. It recommended reinstating Ms. Wright to her proper position and rank within JROTC.

70. On or about November 29, 2021, Ms. Wright's Parents submitted a grievance letter to the District regarding the JROTC instructors' campaign of retaliation.

71. In their grievance letter, Ms. Wright's Parents requested, among others, the following actions. FHS and the District will:

   a. Stop the targeting, ostracizing, and bullying Ms. Wright received in the JROTC program;

   b. Discipline and hold the JROTC instructors accountable for their conduct regarding Ms. Wright;

   c. Protect Ms. Wright from further contact with [STUDENT 1];

   d. Prevent the JROTC instructors from continuing to exclude Ms. Wright;

e.  Train the JROTC instructors on the following subjects, among others:

        i.   Sexual harassment and misconduct;

        ii.  Responding to reports of misconduct;

        iii. Internal biases;

    f.  Clearly delineate the roles and responsibilities between the School and JROTC leadership;

    g.  Clearly define the parent notification expectations for JROTC instructors;

    h.  Provide a clear timeline of events surrounding Ms. Wright's initial disclosure, including whether mandatory reports were uncompleted;

    i.  Train JROTC cadets on sexual harassment and misconduct;

    j.  Report the JROTC instructors conduct to JROTC headquarters.

72. On or about December 10, 2021, FHS responded to the grievance as follows, among others:

    a.  The JROTC instructors' conduct could be construed to violate Board of Education Policy JLF REPORT OF CHILD ABUSE/CHILD PROTECTION.

    b.  There was a pattern of sexual harassment that took place in the JROTC program, and the JROTC instructors' actions strike of retaliation, silencing victims, and chilling others from reporting.

    c.  Defendant Hinson violated Board of Education Policy AC and AC-R-2 Sexual Harassment Investigation Procedures. Defendant Hinson established himself as the decision maker in the sexual harassment investigation. All future complaints shall be brought to the attention of the principle and any investigation shall be conducted by building administrators not program supervisors.

d. Defendants Hinson, Easley, and Hartley violated Board of Education Policy AD and AD-R by failing to ensure a safe and secure environment free from sexual harassment, threats of violence, and intimidation. The JROTC instructors were aided in violating these policies by the deferential relationship between the program and FHS administration.

e. Defendant Hinson violated FHS's Cultural Compass by failing to contact her parents, suspending her from her position, demoting her in rank, and by directing Defendant Hartley to communicate with the Wrights in his stead.

f. FHS administration will develop a JROTC program handbook delineating roles, responsibilities, and reporting structures between FHS administration and the program. The handbook will be distributed to parents of students in JROTC.

g. All members of the JROTC program will undergo annual sexual harassment training.

h. JROTC instructors and all FHS administrators will undergo annual Title IX training, including reporting and investigation requirements.

i. FHS administration will contact JROTC headquarters to inform them of the outcomes of the Title IX investigation and grievance.

73. On or about January 5, 2022, the District notified parents and students in the JROTC program that Defendant Hinson would no longer command the JROTC program and that, in the interim, Defendants Hartley and Easley would supervise the program until a replacement could be found.

74. Defendants Hartley and Easley supervised the FHS JROTC program for the remainder of the 2021-2022 academic year, after which Defendant Easley retired.

75. In May 2022, Ms. Wright graduated from FHS. However, she did so without any of the scholarships she had sought at the beginning of the school year, and without any chance of attending the Air Force Academy.

76. This, among other things, resulted in financial and other damages.

77. In the fall of 2022, Ms. Wright attended Metropolitan State University of Denver ("MSU") as an undergraduate. However, because she had been dependent on the scholarships available through JROTC, she was unable to remain at MSU for the full semester. Because she could not afford college without the scholarships, Ms. Wright dropped out in the fall of 2022.

78. Without the chance of becoming an officer, Ms. Wright worked privately for the remainder of 2022 and enlisted in the Air Force in February 2023. Because of the Defendants' actions, she will never attain the rank, pay, or other benefits of an officer position in the Air Force.

79. Accordingly, the campaign of retaliation and harassment orchestrated by Defendant Hinson and carried out by Defendants Easley and Hartley, and through the powers and supervision provided to them by the District, fundamentally changed the course of Ms. Wright's life. Due to the Defendants' actions, she lost the ability to attend the Air Force Academy or any other collegiate JROTC program and lost the ability to enter the Air Force as an officer, significantly curtailing her future earning potential and prestige. In their place she suffered from intimidation and harassment at the hands of District employees.

## IV. LEGAL OVERVIEW

### a. *The Equal Protection Clause and Title IX*

80. Section I of the Fourteenth Amendment to the United States Constitution provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. IX.

81. Consistent therewith, Title IX of the Education Amendments provides, in pertinent part, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance ...." 20 U.S.C. § 1681(a). Title IX expressly contemplates within its nondiscrimination mandate "any public or private preschool, elementary, or secondary school . . ." *Id.* at (c).

82. Whether or not a student files a complaint of alleged sexual misconduct or otherwise asks a school to take action, where a school knows or reasonably should know of an incident of sexual misconduct it must takes steps to understand what occurred and to respond appropriately. U.S. Dept. of Educ. O.C.R., Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, p. 12 (Jan. 2001) (hereinafter "2001 Guidance"), *available at https://tinyurl.com/yaeajxkz*.

83. Title IX's prohibitions on sexual discrimination incorporates an implied prohibition on "retaliation against individuals because they have complained of sex discrimination." *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1315 (10th Cir. 2017(citing *Jackson v. Birmingham Bd. of Educ.,* 544 U.S. 167, 183 (2005)).

84. "To plausibly plead a retaliation claim, plaintiff must allege facts that the defendants took adverse action against him for complaining of sex discrimination." *Holmstrom v. Univ. of Tulsa,* No. 22-CV-0408-CVE-JFJ, 2023 U.S. Dist. LEXIS 79478, at *14 (N.D. Okla. May 8, 2023)

*a. The First Amendment and Freedom of Speech*

85. The Free Speech Clause of the First Amendment states "Congress shall make no law . . . abridging the freedom of speech . . ." U.S. Const. Amend. I.

86. Consistent therewith, the United States Supreme Court has held that students' right to freedom of speech do not end "at the schoolhouse gate." *Tinker v. Des Moines School Dist.*, 393 U.S. 503, 509 (1969).

87. Under *Tinker*, a student's speech may only be curtailed where it 1) "materially and substantially interfere[s] with the requirement of appropriate discipline in the operation of the school", *ibid.,* or 2) "bears the imprimatur of state sponsorship". *Seamons v. Snow*, 84 F.3d 1226, 1237 (10th Cir. 1996) (citing *Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 270-71 (1988).

88. In *Seamons* the Tenth Circuit held that a student has a protected First Amendment interest in reporting sexual misconduct at school where: 1) such a report is "narrowly tailored to the audience of school administrators, coaches, family and participants who need to know about the incident"; 2) it "neither disputed classwork nor invaded the rights of others students"; and 3) it was not part of a school-sponsored expressive activity." *Seamons*, 84 F.3d at 1238. Under such circumstances the school's interest in repressing the speech "based on [a] fear of a disturbance . . . is not a sufficient justification to punish [the student's] speech." *Ibid.*

## V.    CLAIMS AND CAUSES OF ACTION

**A. FIRST CLAIM FOR RELIEF: 20 U.S.C § 1681(a) *et. seq.* – Retaliation in Violation of Title IX of the Education Amendments of 1972 – Against Falcon School District 49, Hinson, Easley, and Hartley, in their official capacities.**

89. Plaintiff realleges all other paragraphs as if fully set forth herein.

90. Title IX of the Education Amendments of 1972 provides that no person shall be "excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance" based on their sex. 20 U.S.C. § 1681(a).

91. The Supreme Court has long recognized that Title IX's protections similarly prohibit sex-discrimination retaliation. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005).

92. To plead a retaliation claim, a plaintiff must establish that she engaged in an activity protected by Title IX, the defendant had knowledge of the protected activity, and the plaintiff suffered adverse action thereafter. *See Doe v. Brighton Sch. Dist. 27J*, 612 F. Supp. 3d 1205, 1213 (D. Colo. 2020) (citing *Berry v. Mission Grp. Kansas, Inc.*, 463 F. App'x 759, 766 (10th Cir. 2012). The plaintiff must also establish a causal connection between the protected activity and the adverse action. *Ibid.*

93. Here, Plaintiff was subjected to unlawful retaliation in violation of Title IX. First, she reported sexual misconduct to the Defendants, a protected activity. Second, the Defendants all knew of the protected activity. The JROTC instructors gained knowledge first-hand from the Plaintiff, which, as employees of the District with power to address the Plaintiff's complaint, is imputed to the District itself. Third, as detailed throughout this complaint, Plaintiff's suffered myriad adverse actions immediately after engaging in the protected activity and throughout the semester.

94. In more detail, the adverse actions suffered by the Plaintiff included, but are not limited to: 1) suspension, demotion, and permanent removal from her command position; exclusion from JROTC events; 2) modifications to her duties and assignments to junior-

level tasks; and 3) removal from qualification for JROTC scholarships. These actions were causally connected to the Plaintiff's protected activity because they had never occurred before Plaintiff reported sexual misconduct to the JROTC instructors and they began the same day Plaintiff made her report. Furthermore, the adverse actions continued until the JROTC instructors were specifically directed not to retaliate against the Plaintiff.

95. Moreover, the Defendants engaged in conduct and made specific statements expressly notifying the Plaintiff that the adverse actions were due to her report: 1) the Defendants explicitly criticized the Plaintiff for informing school administration; 2) the Defendants suspended and demoted the Plaintiff for failing to tell the "truth" and for informing school administration; 3) the Defendants repeatedly justified their actions by asserting the Plaintiff's leadership and integrity were deficient for making the report and for not handling it internally within JROTC; 4) the Defendants made comments to the Plaintiff and other students clarifying that the Defendants perceived the Plaintiff as a problem to be excised from the JROTC program (e.g., Defendant Hinson's comments that he removed "the drama" by excluding Plaintiff and Defendant Hinson's impromptu lesson on misinterpreting sexual advances).

96. As agents of the Defendant District with power to respond to Plaintiff's report and to take corrective action through involving School administration, separating the Plaintiff from [STUDENT 1], and discipline the JROTC corp., the individual Defendants knowledge and actions are properly imputed to the District. *See Gebser v. Lago Vista Indep. Sch Dist.*, 524 U.S. 274, 290 (1998). ("An 'appropriate person' under § 1682 is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination.").

97. The Defendants actions are not entitled to qualified immunity for their alleged acts and omissions.

98. As referenced above, and incorporated herein, the Plaintiff's right to be from retaliation under Title IX and the Fourteenth Amendment to the U.S. Constitution are clearly established. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005).

99. As a direct and proximate result of Defendants' conduct, Plaintiff was deprived of her Constitutional and statutory rights and suffered damages including loss of scholarships and enrollment in college, including lost wages and prestige as a result, as well as severe emotional distress entitling her to compensatory and special damages, in amounts to be determined at trial.

100. Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b), pre-judgment interest, and costs as allowable by federal law.

101. Plaintiff is also entitled to punitive damages against Defendants pursuant to 42 U.S.C. § 1983 as Defendants acted maliciously, willfully, or with a reckless and wanton disregard for Plaintiff's Constitutional rights.

**B. SECOND CLAIM FOR RELIEF: 20 U.S.C. § 1681(a) *et. seq.* – Violation of and Retaliation against the Free Exercise of Speech as Protected by the First Amendment to the U.S. Constitution – Against Falcon School District 49, Hinson, Easley, and Hartley, in their official capacities.**

102. Plaintiff realleges all other paragraphs if fully set forth herein.

103. 42 U.S.C. § 1983 provides that: "Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured

by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress ….”

104.     The Free Speech Clause of the First Amendment prohibits the government from restricting or prohibiting the exercise of speech. U.S. Const. Amend. I.

105.     Minors' speech protections extend to schools so long as the speech does not “materially and substantially disrupt the work and discipline of the school.” *See Tinker,* 3939 U.S. at 513.

106.     Plaintiff is a citizen of the United States and Defendants are persons for purposes of 42 U.S.C. § 1983.

107.     At all relevant times, Defendants were acting under the color of state law in their capacity as employees at a publicly funded high school, and they were operating within the scope of their employment.

108.     Defendants are not entitled to qualified immunity for their alleged acts and omissions. Plaintiff has a clearly established right to report sexual misconduct free from punishment and retaliation. *See Seamons*, 84 F.3d 1226, 1238 (10th Cir. 1996).

109.     The individual Defendants were appropriate persons for Plaintiff to report sexual misconduct to, given their charge to supervise and discipline the JROTC program. *See Gebser v. Lago Vista Indep. Sch Dist.*, 524 U.S. 274, 290 (1998).

110.     The Defendants had no “overriding school interest in denying [the Plaintiff] the ability to report [sexual misconduct.]” *Ibid.* Plaintiff's report of sexual harassment and misconduct was narrowly tailored to her audience, primary supervisory authorities over the JROTC program with the power to conduct discipline. Her speech was not part of a “school-sponsored expressive activity”, nor did it have “the imprimatur of school

sponsorship." *Ibid.* Her speech also did not disrupt classwork nor interfere with the rights of other students. *Ibid.*

111.      In response to the Plaintiff's report, the Defendants sought to censor her statement and punished her when she escalated the report to non-JROTC administrators. The Defendants' retaliatory campaign continued until the District completed a Title IX investigation and grievance response, four months after the Plaintiff's initial disclosure.

112.      During those four months, the Plaintiff' suffered direct retaliation from the Defendants.

113.      As a direct and proximate result of Defendants' conduct, Plaintiff was deprived of her Constitutional rights and suffered other damages including loss of scholarships, loss of a college education, loss of wages, and severe emotional distress, entitling her to compensatory and special damages, in amounts to be determined at trial.

114.      Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b), pre-judgment interest, and costs as allowable by federal law.

115.      Plaintiff is also entitled to punitive damages against Defendants pursuant to 42 U.S.C. § 1983 as Defendants acted maliciously, willfully, or with a reckless and wanton disregard for Plaintiff's Constitutional rights.

    **C.  THIRD CLAIM FOR RELIEF: 42 U.S.C. § 1983 – Deliberate Indifference to Sex Discrimination in Violation of the Equal Protection Clause of the Fourteenth Amendment – against Hinson, Hartley, and Easley, acting in their individual and official capacities.**

116.      Plaintiff realleges all other paragraphs as if fully set forth herein.

117.     The Equal Protection Clause requires government officials to treat an individual in the same manner as others in similar conditions and circumstances. U.S. Const. Amend. IX.

118.     It has been clearly established" in the 10th Circuit "since at least 1992 that a person who exercises a state's supervisory authority may be held liable for consciously acquiescing in sexually harassing conduct by a non-state actor over whom the state actor has authority." *Murrell v. School Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1251 (10th Cir. 1999).

119.     Principals and teachers are "persons" subject to liability for deliberate indifference to peer-to-peer sexual harassment by minor students. *See ibid.*; *Lameda v. Indep. Sch. Dist. No 29*, No. CIV-21-119-D, 2021 U.S. Dist. LEXIS 180289, at *9 (W.D. Okla. Sep. 21, 2021).

120.     Where teachers refuse to "make any response to [a student's] requests for assistance and fail[] to put in place any measures to protect [the student], [they] deliberately le[ave] [students] vulnerable to sexual harassment and retaliation." *Lameda*, No. CIV-21-119-D, 2021 U.S. Dist. LEXIS 180289, at *9 (W.D. Okla. Sep. 21, 2021).

121.     "Any harassment of [a student-reporter] . . . motivated by retaliatory animus for reporting a sexual assault [is] 'discrimination on the basis of sex.'" *Ibid.* (quoting *Doe v. Sch. Dist. No. 1,* 970 F.3d 1300, 1311 (10th Cir. 2020) (internally quoting *Jackson*, 544 U.S. at 173-174 (2005) (internal quotation marks omitted)).

122.     Plaintiff has a clearly recognized protected interest in her right to an education free from sex-based discrimination.

123. Plaintiff' informed Defendants of the pattern of sexual harassment and misconducted she experienced due to [STUDENT 1]. The Defendants failed to take any action to address or prevent the sexual harassment from continuing.

124. Defendants, as JROTC instructors were teachers and appropriate persons within the meaning of § 1983 to address Plaintiff's sexual harassment complaint.

125. Rather than address Plaintiff's complaint, Defendants responded by harassing, criticizing, and punishing Plaintiff.

126. Defendants' deliberately ignored Plaintiff's right to be free from sex-based discrimination and actively retaliated against her for making the report.

127. Defendants are not entitled to qualified immunity for their alleged acts and omissions.

128. As a direct and proximate result of Defendants' conduct, Plaintiff was deprived of her Constitutional rights and suffered other damages including, but not limited to, lost scholarships, lost college enrollment, accrued student debt, and loss of future employment, including position, prestige, and benefits within the U.S. Air Force, as well as severe emotional distress, entitling her to compensatory and special damages, in amounts to be determined at trial.

129. Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b), pre-judgement interest, and costs as allowable by federal law.

130. Plaintiff is also entitled to punitive damages against Defendants pursuant to 42 U.S.C. § 1983 as Defendants acted maliciously, willfully, or with a reckless and wanton disregard for Plaintiff's Constitutional rights.

## VI. DAMAGES

131.     The Defendants' discriminatory and retaliatory conduct alleged hereinabove has

caused the Plaintiff the following damages:

    a.   Lost J-100 scholarship and enrollment in an AFROTC program, causing

        decreased wages and benefits in amounts to be established at trial;

    b.   Emotional upset, stress, and anxiety in amounts to be established at trial;

    c.   Out-of-pocket expenses, litigation costs, and attorneys' fees in amounts to be

        established at trial.

132.     Defendants' violations of Title IX, the Equal Protection Clause, and the Free

Speech Clause were willful, entitling the Plaintiff to an award of punitive damages to the

fullest extent permitted by law.

### VII.    REQUEST FOR RELIEF

133.     The Plaintiff requests that the Court enter judgment in her favor and against

Defendants as follows:

    a.   Awarding the Plaintiff special damages for lost wages, benefits, and out-of-pocket

        expenses in amounts to be established at trial;

    b.   Awarding the Plaintiff general damages for emotional distress in an amount to be

        established at trial;

    c.   Punitive damages, pursuant to 42 U.S.C. § 1981, 2000(e), in the maximum

        amount permitted by law;

    d.   Awarding the Plaintiff statutory and reasonable attorneys' fees, litigation

        expenses, and costs incurred in this action;

    e.   Awarding the Plaintiff pre-judgment interest; and

f.  Awarding the Plaintiff any additional and further relief that the Court finds

equitable, appropriate, or just.

> **PLAINTIFF REQUESTS A JURY ON ALL ISSUES SO TRIABLE**

*/s/ Igor Raykin*
Igor Raykin, Esq.
Kishinevsky & Raykin, Attorneys at Law
2851 South Parker Road, Suite 150
Aurora, CO 80014
Telephone: (720) 767-1846
E-mail: igor@coloradolawteam.com

*/s/ Conor O'Donnell*
Conor O'Donnell, Esq. Atty. Reg. # 58077
Kishinevsky & Raykin, Attorneys at Law
2851 S. Parker Rd., Ste. 150
Aurora, CO 80014
Phone: 720-588-9713
E-mail: conor@coloradolawteam.com